# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

UNITED STATES OF AMERICA,   )
                                   )
v.                                )          CR420-118
                                   )
LEON BLAKE,                    )
                                   )
           Defendant.      )

## ORDER AND REPORT AND RECOMMENDATION

The Court previously entered a Report and Recommendation (R&R) recommending that Defendant Leon Blake's Motion to Suppress be denied. *See* doc. 83. Defendant objected to that recommendation and identified a factual mistake that affects its analysis. *See* doc. 87. The misstatement and its implications are discussed more fully below. Given the need to address the factual error, the Court **VACATES** the R&R, doc. 83, and replaces it. For the reasons explained more fully below, Blake's Motion to Suppress his statements to law enforcement should be **DENIED**. Doc. 64.

## BACKGROUND

In July 2020, the Savannah Police Department was contacted by the Kentucky State Police regarding an investigation into an incident of

child enticement in which Blake had been identified as a suspect.  Doc. 64 at 2; doc. 66 at 2.  In attempting to arrange an interview with defendant, Detective Nielsen[1] contacted his mother and father.  During these conversations, the defendant's father informed her that  he suspected that defendant's intelligence was below that of an average person. Def. Ex. D.

Nielsen first communicated with defendant via telephone on July 30, 2020.  During the telephone conversations, Nielsen did not explain the full circumstances of the investigation, instead she told defendant that it concerned someone that he might know and assured him that he was not in trouble.  Gov't. Ex. 1–3; Def. Ex. B.  Defendant agreed to appear at the Savannah Police Department on July 31, 2020, to answer questions.  Doc. 64 at 2; doc. 66 at 2.

Defendant voluntarily appeared for the interview, which took place in a closed interrogation room.  The interview had a conversational tone and lasted for approximately one hour.  Def. Ex. C.[2]   Early in the

---

[1] At the time of the investigation, Detective Nielsen was employed by the Savannah Police Department.  She has since transitioned to a job with another law enforcement agency.

[2] The Government and defendant have submitted redundant exhibits.  When possible, the Court will refer only to the exhibits submitted by defendant, as the moving party.

interview, Nielsen explained to defendant the nature of the Kentucky investigation and that he was considered a suspect. *Id.* She did not advise defendant of his *Miranda* rights. Doc. 64 at 3; Def. Ex. C. During the course of the questioning, she claimed to "already have the information that says that [defendant] was there," and advised him of some of the types of evidence that had been collected, including a video of him with the alleged victim. Def. Ex. C. She also provided an explanation for how a person's approximate location can be determined by the transmission towers used by their cellular phones. *Id.*

Defendant initially denied having visited Kentucky and claimed to have never travelled farther than Tennessee. Def. Ex. C. He also denied recognizing the alleged victim of the offense when presented with a photo. *Id.* His story changed multiple times in response to Nielsen's questioning. Many of the questions asked were framed to give defendant an opportunity to provide an explanation for this evidence or to resolve inconsistencies in his story. *Id.* He ultimately conceded to traveling to

---

The parties' exhibits were provided on electronic storage media and are in the possession of the Clerk. Doc. 78.

Kentucky, picking up an as-yet-conclusively-identified female,[3] who he claimed to know only as "Jessica," and taking her to a hotel room. *Id.* He admitted to kissing and touching "Jessica" but denied having sexual intercourse or acting without her consent, apparently recognizing that those acts would be wrong. *Id.* At the end of the interview, Blake left the station; he was not arrested. *Id.*

Defendant alleges that he is intellectually disabled "with particular deficiencies in verbal comprehension." Doc. 64 at 3. In support of this, he offers an evaluation by Dr. Anna Jackson, who diagnosed him with "intellectual development disorder, mild."[4] *Id.*; doc. 64-2. Dr. Jackson's report notes that those with such a disorder "typically have deficits in abstract thinking (thinking characterized by the use of general ideas or concepts), executive functioning (planning, strategizing, priority setting, focusing attention, remembering details, managing multiple tasks, and

---

[3] Blake objects to the prior R&R's characterization of the person in question, who Blake identified as "Jessica." *See* doc. 87 at 8-9. The description in the prior R&R was not intended to support any inference "that 'Jessica' and the alleged victim are the same individual . . . ." Doc. 87 at 9. The Court has undertaken to describe the individual in question in a more neutral, if less succinct, fashion here.

[4] Dr. Jackson did not appear to testify at the hearing. Though lack of the preparer's testimony would normally cause the report to qualify as inadmissible hearsay, it was admitted into evidence with the consent of all parties.

cognitive flexibility), short[-]term memory, and functional use of academic skills (reading and money management)." Doc. 64-2 at 8. She concluded that defendant was "at a higher risk of suggestibility, susceptibility to leading questions, confabulation, and acquiescence." *Id*. at 9.

## ANALYSIS

Defendant asserts that the statements he made should be suppressed because the interview was custodial and *Miranda* warnings were not given. Doc. 64 at 1. He also argues that that his intellectual disability makes him particularly vulnerable to certain interrogation techniques and, therefore, the statements he made during his interview were not voluntary. *Id*. The motion should be denied as to both arguments.

## I.   Lack of *Miranda* Warnings

*Miranda* warnings are prophylactic measures to ensure that a defendant's constitutional right against self-incrimination is protected; however, they are only required where the interrogation occurs in a custodial setting. *Miranda v. Arizona*, 384 U.S. 436, 471 (1966). Whether a suspect is "in custody" depends upon "whether there is a

formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotes and cite omitted).   Determining custody is a context-driven, objective inquiry.  *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (evaluation of custody is context-sensitive, but objective); *see also United States v. Eubank*, 2015 WL 3557493 at * 6 (S.D. Ga. Mar. 18, 2015).  The Court must consider the specific facts of the interview through the eyes of "a reasonable innocent person."  *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006); *Eubank*, 2015 WL 3557493 at * 6 ("The test [for custody] is an objective one: taking into account all the circumstances surrounding the interrogation, would a reasonable person—one innocent of any wrongdoing—have felt that he was not free to terminate the interview and leave." (cites omitted)).

The burden of proving that the interrogation was custodial falls to the defendant.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)[5] (noting that a defendant must establish that he is subject to custodial interrogation before the burden shifts to the government to

---

[5] The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

demonstrate a voluntary waiver of rights).  If the interview is determined custodial and *Miranda* warnings were not given, the statements may be deemed to have been made involuntarily.  *See, e.g., Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires the exclusion of any statement obtained.").  Blake has not shown that the interrogation was custodial.

Before considering whether Blake was in custody when he made the challenged statements, his objection correctly identifies a factual misstatement in the prior R&R.   Blake objects that "[t]he R&R erroneously asserts that Mr. Blake was told that he was not under arrest."  Doc. 87 at 7; *see also* doc. 83 at 6 ("Though he was advised that he was a suspect in a crime, he was told that he was not under arrest."). The Court has reviewed the exhibits and transcript and Blake's objection is correct; there is no evidence that Blake was told that he was not under arrest.  As discussed below, notwithstanding that mistake, the Court still should find that Blake has failed to show that the interrogation was custodial.

Without minimizing the previous R&R's factual error, the record supports that Neilsen *implied* Blake was not under arrest, even if she never said so explicitly. As Blake's objection points out, he was told that he was "not in any trouble." Doc. 87 at 6. As discussed below, that very vague statement suggests that Neilsen did not intend to arrest Blake at the time of the interview. She confirmed that suggestion in her testimony, that she did not intend to arrest him. *See* doc. 87-1 at 21-22. Moreover, it is undisputed that Blake was not arrested at the conclusion of the interview. The combination of Neilsen's vague assurance, her testimony concerning her intention not to arrest Blake, and the fact that Blake was not arrested explain, even if they do not excuse, the Court's mistake.

Even though Nielsen's statement that Blake was "not in any trouble," is not tantamount to informing him that he was not under arrest, the strong implication of that statement is relevant to the custody analysis. The Seventh Circuit has recognized that such ambiguities are properly factored in the custody analysis. *See United States v. Patterson*, 826 F.3d 450, 458 (7th Cir. 2016) ("Though the agents may not have used the exact words 'you are not under arrest,' that message was conveyed

8

to" the defendant). *Cf. Schuster v. Espinoza*, 2019 WL 7050086, at * 14 (E.D. Cal. Dec. 23, 2019) ("Here, however, although the detectives never told [the criminal defendant] she was free to leave, they implied this was so . . ."); *United States v. Sosa*, 2015 WL 6751062, at * 3 (S.D. Fla. Nov. 5, 2015) ("Although the [IRS's 'Non-Custodial Statement of Rights'] did not expressly inform [defendant] that he was free to leave, it implied as much insofar as it informed him that he did not have to talk to the agents."); *United States v. Kling*, 2006 WL 1980179, at * 3 (N.D. Iowa July 12, 2006) ("According to the agents, they implied throughout the interview that [defendant] was free to return to work if he wanted to, although no officer expressly told [him] he did not have to answer questions or he was free to leave.").  Even in the absence of an explicit statement that Blake was not under arrest and free to leave, Neilsen's initial statement that he wasn't "in trouble," and her detailed explanation of the circumstances at the inception of the interview, discussed below, implied that Blake was neither under arrest, nor even about to be. Factored in the totality of the circumstances, that implication weighs against finding that Blake was in custody.

Blake's principal argument that he was in custody turns on his contention that his intellectual disability should be considered in that analysis. *See* doc. 64 at 18–19; *see also* doc. 87 at 6-7. The sole support he offers for this position is the Supreme Court's opinion in *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), a case concerning the interrogation of children. *J.D.B* holds that a child's age, if it is known or discernable to the interviewing officer, is relevant to the objective custodial analysis. *Id.* at 277. In reaching this conclusion, the unique historical treatment of children as a class before the law weighed heavily. *Id.* at 272–77. Based, at least in part, on the uniqueness of that status, the Supreme Court reiterated that, generally, "[t]he test . . . involves *no consideration of the 'actual mindset' of the particular suspect subject to police questioning*." *Id.* at 271 (emphasis added) (citations omitted). There is, therefore, no suggestion that *J.D.B.* did more than create an exception to the otherwise objective character of the custody analysis, and the consequent irrelevance of a suspect's subjective beliefs.[6] *See, e.g., United*

---

[6] In explaining the significance of the special status of children the *J.D.B.* Court notes the discussion of the custody test's objectivity in *Yarborough v. Alvarado*, 541 U.S. 652 (2004), and its specific concern with "compromising the objective nature of the custody analysis." *J.D.B.*, 564 U.S. at 275. The dissenting justices are explicitly concerned that the implication of the majority's opinion will "effect a fundamental transformation of the *Miranda* custody test—from a clear, easily applied prophylactic

*States v. Deason*, 965 F.3d 1252, 1259 (11th Cir. 2020) (quoting *Brown*, 441 F.3d at 1347)); *see also J.D.B.*, 564 U.S. at 286-87 (Alito, J. dissenting) (noting that only "the external circumstances, that is, of the interrogation itself" have mattered to the custody analysis, and "[p]ersonal characteristics of suspects have consistently been rejected or ignored as irrelevant under a one-size-fits-all reasonable-person standard."), 288 (Alito, J. dissenting) ("The *glaring absence* of reliance on personal characteristics in these and other custody cases should come as no surprise. To account for such individualized considerations would be to contradict *Miranda's* central premise." (emphasis added)).

The Court does not accept the equivalency Blake's argument draws between children and intellectually disabled adults. There are, unquestionably, some commonalities between the characteristics identified by the Supreme Court as intrinsic to children and those attributed by Dr. Jackson to defendant, including immaturity and susceptibility to outside pressures. *See* doc. 64-2 at 8–9; *J.D.B.*, 564 U.S.

---

rule into a highly fact-intensive standard resembling the voluntariness test that the *Miranda* Court found to be unsatisfactory." *Id.* at 283 (Alito, J. dissenting). That concern implies that *J.D.B.* did not, *by itself*, create more than an exception. Absent guidance from the "future cases" envisioned by Justice Alito in dissent, *id.*, this Court should not accept Blake's invitation to innovate.

at 272–73.  *Cf. id.* at 283 (Alito, J. dissenting) (identifying "intelligence, [and] education" among the "personal characteristics . . . that may correlate with susceptibility to coercive pressures.").  Blake offers no argument, however, that intellectually disabled adults should be treated as children.  Regardless of his intellectual capacity, defendant has certain advantages over a child as a function of his age.  Unlike a child, defendant was not physically smaller than his interrogator.  He was also able to draw upon a greater reservoir of life experiences and accumulated understanding, as was demonstrated when he explained to Nielsen that he never initiates sex because he does not want to be accused of something that he did not intend by the other person.  Def. Ex. C.  As defendant is an adult, regardless of his alleged intellectual limitations, his subjective view of his ability to terminate the interview is not relevant to the Court's analysis.  *Brown*, 441 F.3d at 1347.

Blake objects that reliance on *Brown* is mistaken.  *See* doc. 87 at 6-7.  While Blake is correct that "*Brown* does not discuss intellectual limitations," doc. 87 at 7, it does discuss the well-established objectivity of the custody evaluation.  *Brown*, 441 F.3d at 1347 (" ' The test [for whether a defendant was in custody during questioning] is objective: the

actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave *are irrelevant.*'" (emphasis added) (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).  As discussed above, *J.D.B.* does not explicitly alter the objectivity of the custody analysis.  In the absence of authority that expands *J.D.B.*'s exceptional treatment of children, this Court should continue to apply the well-established test that, "often require[s] courts to ignore personal characteristics that may be highly relevant to a particular suspect's actual susceptibility to police pressure."  *J.D.B.*, 564 U.S. at 282 (Alito, J. dissenting).

The totality of the remaining circumstances of the interview support a finding that Blake was not in custody.  First, the fact that he voluntarily appeared for the interview strongly supports the conclusion that it was not custodial.  The Eleventh Circuit has considered a similarly voluntary interview of a suspect with mental health issues.  *See Purvis v. Dugger*, 932 F.2d 1413, 1415 (11th Cir. 1991) (noting that the defendant in the underlying criminal case, Purvis, had "a history of psychiatric treatment for chronic schizophrenia, [and an] eight to ten-year-old mentality").  The court expressly noted that he "voluntarily went

13

to the police station and was never placed under arrest or restrained in any way . . . ." *Purvis*, 932 F.2d at 1419.  Purvis also "never asked to go home." *Id.*  The court concluded that Purvis was not in custody.  *Id.*; *see also United States v. Jonas*, 786 F.2d 1019, 1022 (11th Cir. 1986) (finding no *Miranda* violation where a defendant was informed that law enforcement "wanted to talk to him in connection with an investigation," he "appeared voluntarily" for the interview, and "was not at any time under restraint and that at all times he was free to terminate the interview."); *United States v. Harrell*, 2018 WL 6796172, at * 3 (N.D. Ga. Sept. 19, 2018) (collecting cases).  The analogy between the facts at issue here and in *Purvis* support the conclusion that Blake was not in custody.

While questioning at a police station suggests custody, that circumstance is completely outweighed by Blake's voluntary appearance for the interview, discussed above, combined with the fact that his movement was never restrained, the generally conversational tone of the interview, its limited length, and the fact that he was released at the conclusion of the interview.  *See, e.g., Yarborough*, 541 U.S. at 664-65 (identifying factors weighing in favor of a custody finding including the fact that the interview occurred at a police station and that the suspect

was not told he was free to leave, and factors weighing against a custody finding including that police did not transport defendant to the police station, did not require him to appear at a particular time, did not suggest he would be placed under arrest, and that the suspect went home at the end of the interview); *United States v. McDowell,* 250 F.3d 1354, 1363 (11th Cir. 2001) (interview lasting four hours was not sufficient to establish that defendant was in custody); *United States v. Long*, 866 F.2d 402, 405 (1989) (factors supporting custody finding include "if the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.").

Blake has simply not borne his burden of showing that the totality of the interview's circumstances were objectively tantamount to formal arrest.  The Court should, therefore, find that he was not in custody during the interview.  To the extent that his Motion asserts that his statements should be suppressed on that ground, it should be **DENIED**.

## II.   Involuntariness of Defendant's Statements

Defendant also asserts that his statements should be suppressed because they were not made voluntarily.  The Government bears the burden of establishing the voluntariness of challenged statements.  *See*

*United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (citing *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). A confession is involuntary, and thus inadmissible, "only when the [totality of] the circumstances show that 'coercive police activity' overcame the defendant's free will." *Arvelo v. Sec'y Fla. Dept. of Corrs.*, 687 F. App'x 901, 904 (11th Cir. May 10, 2017) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). "Some form of government coercion is essential to a finding of involuntariness." *United States v. Lynn*, 547 F. Supp. 2d 1307, 1310 (S.D. Ga. 2008) (citing *Connelly*, 479 U.S. at 167). As this Court has explained:

> In determining voluntariness, the Court must assess "the totality of the circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Coercive conduct normally involves an exhaustively long interrogation, the use of physical force, or the making of a promise to induce a confession. *Connelly*, 479 U.S. at 163 n. 1; *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992). Ultimately, the Court must determine "whether a statement was made freely or whether the defendant's 'will has been overborne and his capacity for self-determination has been critically impaired.'" *Devier v. Zant*, 3 F.3d 1445, 1455–56 (11th Cir. 1993) (quoting *Culombe*, 367 U.S. at 602).

*Lynn*, 547 F. Supp. 2d at 1310.

Blake asserts that "in cases were the defendant is intellectually impaired, the voluntariness inquiry is not limited to instances where 'police conduct was inherently coercive, but applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will.'"  Doc. 64 at 9–10 (quoting *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014)).

The Court is unaware of any precedent in this Circuit supporting the proposition that low intelligence warrants a broader view of what conduct might make a defendant's statements involuntary.  In fact, the Eleventh Circuit's case law involving defendants with cognitive capacities limited by mental illness suggests that if the defendant is capable of understanding the interrogation and communicating coherently, the same degree of law enforcement overreach is required as would be for the average defendant.  *Cf. United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (defendant suffering from mental disability or illness "does not render his statements involuntary unless the agents took advantage of his mental illness."); *Arvelo*, 687 Fed. App'x at 906

(mental state did not render a confession involuntary where accused was able to understand the interrogation and communicate coherently).

This is not to say that a defendant's low intelligence is not a relevant consideration, s*ee Schneckloth*, 412 U.S. at 226 (listing lack of education and low intelligence among factors to be considered), but it alone does not "dispose of the inquiry into constitutional voluntariness." *Connelly*, 479 U.S. at 164.  Intellectual capability is but one factor to be considered as the Court weighs the totality of the circumstances of the interrogation.  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010) ("We consider the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary.").

In taking a holistic view of the interrogation and defendant's characteristics, the Court should find defendant's will was not overborne by Nielsen's tactics.  Blake voluntarily appeared for the interview and was at no time physically restrained.   Nielsen informed him of the pendency of the Kentucky investigation and that he was considered a suspect at an early stage of the conversation.  Though he might not have understood the specifics of the alleged crime, in proactively denying that

he engaged in sex with the woman in the picture Neilsen showed him and stressing that he did not force her to act, he demonstrated that he understood the gravity of speaking with law enforcement and that he was suspected of a criminal act. The interview was not excessively long, lasting only an hour, *see United States v. Bhatt*, 160 F. Supp. 3d 1359, 1364–65 (N.D. Ga. 2016) ("lengthy interview of the Defendant while he vulnerably stood in his boxers for [three] hours after the shock of being woken by a large team of armed officers" was not overly coercive), and at no time did Nielsen attempt to threaten or intimidate defendant. Defendant's responses were coherent and both Nielsen and he maintained a calm and conversational demeanor throughout the interview.

After speaking with Blake's father, Nielsen was aware of his potential intellectual limitations, or, at least, his father's contention of those limitations, Def. Ex. D, and she was, perhaps, less than completely forthcoming in assuring that he was "not in any trouble" prior to the interview, Def. Ex. B. Even if her statement was an intentional effort to deceive—and there is no evidence that it was—it alone was not so coercive as to make the statements made during the next-day interview

involuntary. *See, e.g., United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) ("It is clear, that the police's use of a trick alone will not render a confession involuntary.")  Furthermore, though Nielsen did utilize leading and repetitive questioning, the questions seem to have been used to direct the conversation and to invite defendant to provide context and explanation, not to confuse or confabulate. *See Wacker v. State*, 1999 WL 138901, at *4 (D. Kan. Jan. 25, 1999) (finding the use of leading questions with a suspect of borderline intelligence to not be coercive).  Considering the totality of the circumstances, the Government has carried its burden in establishing that defendant's statements were made voluntarily.

Assuming, without deciding, that Defendant is correct that "there is *ample* evidence in the record that Mr. Blake is intellectually disabled . . . ," doc. 87 at 3 (emphasis added)[7], he mistakes the legal significance of that disability to the determination that his statements were voluntary. Defendant is correct that neither *Barbour* nor *Arvelo*, cited above,

---

[7]  The Court notes that Dr. Jackson opined that "Mr. Blake's presentation is consistent with a diagnosis of intellectual development disorder, *mild*." Doc. 64-2 at 7 (emphasis added).  This diagnosis is, charitably, not entirely consistent with counsel's contention, in his Objection, that Blake's disability is "significant." (Doc. 87 at 4).

"forecloses" the consideration of a defendant's disability in determining whether his statements were voluntary.  Doc. 87 at 2.  Blake's argument requires more, however, than that a defendant is not "foreclosed" from arguing the relevance of a disability.   As his reliance on *Preston*, discussed below, shows, his argument's ultimate success requires that disability be dispositive of involuntariness.  That is just not so.

Even assuming, as Blake argues, that his intellectual disability "lowers the bar" for coercive tactics, doc. 87 at 2, there was no coercion sufficient to render his statements involuntary.  Defendant urges the Court to "follow the precedent in *[United States v.] Preston*," *id.*, but even that case recognizes that " ' a finding of involuntariness cannot be predicated solely upon' the defendant's mental state . . . ." 751 F.3d 1008, 1017 (9th Cir. 2014) (quoting *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990)).[8]  Following *Preston*, then, the Court must "focus . . . on

---

[8]   Defendant's Objection seeks to distinguish several of the cases cited by the undersigned on narrow factual grounds.  *See* doc. 87 at 3 (arguing that *Barbour* is distinguishable because "the defendant was suffering from severe depression, not a documented cognitive impairment.");  *see also id.* at 6-7.   However, defendant's reliance on *Preston* depends on ignoring factual distinctions at least as significant. The defendant in *Preston* had "*many significant* deficits in mental functioning." 751 F.3d at 1020-21 (emphasis added).  During the interrogation, he expressed confusion about the meaning of the word "disabled."  *Id.*  As the court noted, "[t]hat he had to ask for an explanation of a common word itself suggests the extent of his cognitive impairment."  *Id.*  Although Dr. Jackson's report includes IQ test results, more than twenty years old, similar to the defendant's in *Preston*, the evidence of Blake's

'whether the defendant's will was overborne by the circumstances surrounding the giving of the confession,' an inquiry that 'takes into consideration the totality of the surrounding circumstances—*both* the characteristics of the accused *and* the details of the interrogation." *Id.* at 1016 (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)) (citation and alterations omitted) (emphasis in original).

Defendant makes much of Detective Neilsen's "deception" when she told Blake, in a phone call a day before the interview, that he "was not in any trouble." Gov. Ex. 3; *see also* doc. 87 at 4. Notwithstanding that deception alone is not sufficient to establish coercion, Neilsen's statement that Blake was not "in trouble" is far too vague to constitute affirmative deception. Although she conceded at the hearing that she knew when she made the statement that Blake was a suspect in an investigation in another jurisdiction, she also testified that there was no warrant for his arrest and she had no intention of arresting him. *See* doc. 87-1 at 22. The record supports, at most, the conclusion that Neilsen was not completely forthcoming with Blake, but such ambiguities do not clear

---

impairment is not commensurate, in either quantity or quality, to the evidence considered by the Ninth Circuit.

even a lowered standard for deceptive conduct.

"Deception," as relevant to the voluntariness analysis includes "lies about a defendant's legal rights (*i.e.*, 'you must answer our questions'), false promises (*i.e.*, 'whatever you say will be just between us'), or threats (*i.e.*, 'if you don't talk, you won't see your family for a very long time')." *United States v. La Forgia*, 2012 WL 1869035, at * 4 (S.D. Ala. May 22, 2012); *see also, United States v. Graham*, 2014 WL 2922388, at * 9-11 (N.D. Ga. June 27, 2014) (collecting cases).  As the Supreme Court stated, albeit in a slightly different context, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak," do not implicate the voluntariness of a confession, even in the heightened circumstances of a custodial interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).  To find that law enforcement's failure to be entirely candid with a criminal suspect rendered any statement he makes involuntary would not "lower" the bar for coercion, it would remove the bar entirely.

Moreover, whatever the character of Neilsen's statement during the July 30 phone call, she was forthcoming about the status of the investigation at the beginning of the interview.  Before posing any

23

substantive questions, beyond Blake's date of birth, his address, his phone number, she expressly informed him: "We [presumably the Savannah Police Department] were contacted by a police department in Kentucky about an investigation . . ." Def. Ex. C at 4:07-4:11. After a brief digression about whether Blake has ever been to Kentucky, she says explicitly, that the police in Kentucky have questions they want put to Blake. Later, after denying that he had ever been to Kentucky, Blake asks, "What about Kentucky?" *Id.* at 6:10. Neilsen does not do anything to obscure the object of the investigation, but immediately shows Blake a picture of the alleged victim. *Id.* at 6:17. After discussing whether Blake knows the person pictured, Neilsen is *again* forthcoming that the person in the picture is "the reason the police in Kentucky reached out to us." *Id.* at 7:48. During the interview, then, Neilsen is unreserved about its nature and subject. Any ambiguity in her statement from the previous day, therefore, was clarified.

Defendant also overstates that coercive quality of Neilsen's questioning during the interview. His Objection contends that Neilsen's use of "leading and repetitive questions" was coercive. *See* doc. 87 at 4-5. Again, assuming without deciding that Blake's intellectual disability

affects the analysis in the way he suggests, review of the audio and video recordings of the interview do not reveal coercive questioning. To be sure, Neilsen does ask questions more than once, but not in a brow-beating fashion. As discussed above, the entire interview lasted less than one hour. *See, e.g.*, Def. Ex. C (Audio Recording). Neilsen never repeated the same question immediately, but "circled back" to solicit the same information multiple times. To the extent that there was "repetition," it appears from the recording to be motivated by Blake's ambiguous or inconsistent responses.[9]

---

[9] Blake's responses to Neilsen's question about whether he has ever been to Kentucky exemplify the sort of "repetition" that occurs in the interview. Neilsen asks Blake very early in the interview whether he has ever been to Kentucky, immediately after informing him that police there are conducting an investigation. After a brief pause, he responds "No." Def. Ex. C at 4:17. She repeats the question shortly thereafter. *Id.* at 4:41. Blake states emphatically that he has "never" been to Kentucky, but continues unprompted to suggest that he has been to a location in Tennessee. When discussing his travel to Tennessee, he volunteers that it was "not far" from Kentucky. *Id.* at 5:40-41. After showing Blake a picture of the alleged victim, who he denies recognizing, she informs him that the person in the picture "lives in Kentucky." *Id.* at 7:46. Blake repeatedly insists that he has never been to Kentucky. After Neilsen explains how cell phone records might reveal a person's location, he repeats that he's never "been to Kentucky," but concedes that "he might have passed." *Id.* at 10:28. He then equivocates: he states that he "wasn't paying attention," but knows he never "stopped" in Kentucky. *Id.* at 10:43. He then introduces the possibility that "someone" was "using" his phone. *Id.* at 11:00. Throughout this entire series of questions, Blake is consistent that he's "never been to Kentucky."

Neilsen continues to question Blake about who might have used his phone. She then asks whether he has ever rented a hotel room for another person, which he denies. She asks whether he's ever stayed at a hotel in Kentucky. *Id.* at 12:38. Blake pauses and ultimately concedes the possibility that he stayed in a hotel in Kentucky. *Id.* at 12:53-54. When asked why he stayed at the hotel that might have been in

Even in the light of *Preston*, the fact that law enforcement uses leading or suggestive questions is not coercive. Even the *Preston* court did not rely solely on the fact that the interviewers' questions were leading. *See Preston*, 751 F.3d at 1014. The court noted that those officers "indicate[ed] that [Preston] was free to stop talking to them only when they terminated the interview, [. . . and,] conveyed, repeatedly that Preston had to tell them *something*, or they would keep coming back until he did." *Id.* at 1013. Moreover, the officers involved *admitted they intended* to convey that implication. *See id.* (interviewing officer "acknowledged [at the suppression hearing] that he meant Preston to understand that the officers would keep coming back until Preston admitted" the alleged criminal conduct). Further, the *Preston* court identified the fact that officers "promised Preston that they would not 'tell this to anybody,' and the statement would never leave the U.S.

Kentucky, he says that he "likes to travel." *Id.* at 13:23. He then states that he met a "friend, named 'Jessica'" while staying in the hotel. Neilsen later confronts him with the allegation that he "stayed at the Ramada in Shelbyville, Kentucky on the day after Christmas, December 26." *Id.* at 17:46-47. Blake then proceeds to describe his interactions with a person he knew as "Jessica." *See id.* at 19:04, *et seq.*

While there may be some lines of repetitive questioning that can overwhelm a vulnerable suspect's will, the recording of Blake's interview does not indicate any such egregious repetition. Neilsen's knowledge of Blake's intellectual disability— assuming that Blake's father's report provided "knowledge"—cannot preclude her from what appear to be no more than normal investigative questions, which probed statements Blake made that Neilsen knew to be inconsistent with other evidence.

Attorney's file.  [And, l]ater they told him that the statement they would write up was just an apology note to the child."  *Id.* at 1014.  There is simply *nothing* in the record that suggests Neilsen employed any tactics similar to those identified in *Preston.*  *Cf., e.g., Wilson v. Lawrence County,* 260 F.3d 946, 952-53 (8th Cir. 2001) (discussing an involuntary confession by a mentally disabled individual, in the context of a 42 U.S.C. § 1983 action, and noting that, in addition to leading questions, "officers lied to Wilson[,]" "offered to help [him] obtain leniency if he confessed . . . [,] [and] insisted that he would undoubtedly be found guilty if he did not confess.  Then, when Wilson failed to provide correct details about the crime, they rebuked him for not cooperating and offered those details to him in a leading question format.  [And, t]hrough the entire interrogation [officers] used threatening tones and language."); *United States v. Hoang*, 238 F. Supp. 3d 775, 788 (E.D. Va. 2017) (citing *Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001)) (discussing the factors in *Preston*, beyond suggestive and leading questions, in rejecting a defendant's suppression argument)

Considering the totality of the circumstances, including Blake's mental disability, the Court should find that the Government has borne

its burden to show that his statements were voluntary.  Accordingly, to the extent that Blake seeks to suppress his statements on the ground that they were involuntary, his motion should be **DENIED**.

## CONCLUSION

Accordingly, the Court **RECOMMENDS** that the motion to suppress be **DENIED**.  Doc. 64.  This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*,

28

648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 24th day of November, 2021.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

29